Thank you, Judge Livingston, and may it please the Court. Sean Murata on behalf of the Plaintiffs' Appellants. We have two claims, one under the First Amendment and one under the Contracts Clause, and I'll take them in that order. On the First Amendment claim comes down to two principles which, when accepted, make the rest of the First Amendment analysis follow pretty easily. First, it is legal in the City of New York under the Fair Act to offer tenant pay brokerage services. The only thing that is illegal under the Fair Act is advertising those tenant pay brokerage services in connection with particular apartments. Second, a broker advertising an apartment with a landlord's permission is not an agent, is not an employee, and is not a fiduciary or otherwise working on the landlord's behalf. Rather, an agent who advertises a listing with a landlord's permission is merely advertising a listing with a landlord's permission. That gives lie to the City's tenant claim that tenant pay open listing brokers are merely landlord's brokers by a different name. Tying that to the legal principles, first, under Sorrell, under 44 Liquor Mart, under Virginia Board of Pharmacy, you can't, if you, you cannot achieve non-speech goals by suppression of truthful, non-misleading speech regarding legal services. Second, if you can achieve the government's goals without burdening speech, then you have to do so. You can't use speech as your proxy. And that ties into the three goals that the government has put forward at various points with respect to the Fair Act. The first goal they've put forward in the committee report is aligning the principal-agent relationship. But you could do that without burdening speech by simply requiring, as the Fair Act originally did, by requiring that the party who hires the broker pay the broker. Second, they've advanced, I think, mostly in litigation an interest in tenant mobility, allowing tenants to more easily move from one apartment to the other. But they could achieve that, but they achieve that goal, at least even arguably, only by presuming that what they have done is they have barred tenant-paid brokerage services. But they haven't. I say that the tenant mobility issue is mostly in litigation, but I thought that, I mean, the bill's sponsor and several council members, when I look at the record and help me understand it if I'm missing something, talked about increasing housing mobility, and there were advocacy groups that addressed the subject and submitted evidence before the council. Right. So there was a lot of discussion about mobility, but I think there's two problems. One, of course, individual statements of various council members don't represent the view of the council. I think the view of the council is the one that's in the committee report, which says we are trying to align the principal-agent relationship. But the second answer, Judge Livingston, is even if you accept there's a mobility interest, you don't solve it by banning speech. Because remember, they haven't barred tenant-paid brokerage services. They've only said you can't advertise it. And what the lesson from Sorrell is, is that even if you have an interest, an important interest in trying to make things more affordable, you can't do that by banning the speech of the side of the debate that you think is making it more expensive. So in Sorrell, the accusation was that if we allow these detailers to go out armed with prescribing information, they're going to talk doctors into prescribing very expensive brand-name drugs instead of cheaper, just-as-effective generic drugs. And they said the way we're going to bring down prices is we're going to take away your ability to be armed with this prescribing data. And what the Supreme Court said was you can't do that. If you want to try to address the problem of prescribers prescribing high-priced brand-name drugs, you can do that. But you can't do it by disarming the speech of one side of the debate. That's what they're doing here. The city is saying we don't like tenant-paid open-listing brokers. And therefore, we're going to take away their ability to advertise their services on places like StreetEasy. You can still go to a broker, and a broker can still say, I'm going to show you some apartments, but by the way, you're going to have to pay me to do that. But the other side of the debate, the land— But that doesn't prohibit the advertisement. I mean, it burdens the advertisement. And that may be enough to bring this within First Amendment scrutiny. But you can still go ahead and advertise. You just can't get a fee from a tenant after you do so. But what you can't advertise is the perfectly legal service of a tenant-paid broker. So, I mean, it's like saying, for instance, you know, you can advertise as an attorney, but if you advertise as an attorney, you can't collect a contingency fee from a plaintiff. Well, you can still practice as an attorney, I guess, but of course what you've done is you've shut down the perfectly legal practice of being a contingency fee plaintiff's attorney. So I agree with you. It may just be a burden. But if you hold constant the legality of tenant-paid brokerage services, you have banned the advertisement. And that's the important point here. Getting to the issue of the city's—whether the city's interests are substantial, you focus on the stated purpose in the bill, that it's to properly align the principal-agent relationship in the rental market. But isn't that overall purpose to improve mobility, to increase affordability? It may not be effective in dealing with the housing crisis, but isn't the purpose designed to do more than just—there's a reason behind realigning the principal-agent relationship. So how can you just focus on that and not recognize that the testimony and the evidence and the investigation done by the counsel all go to this issue of addressing the problem that it's difficult for people to move when they have to pay huge brokerage fees? I think my easiest answer to that question is to say, even if I spot you that that's the purpose and it's an important purpose, they still haven't shown the fit. Because if what you're trying to do is you're trying to solve the fact that people have to pay these fees, banning speech doesn't achieve that goal. And it doesn't—and you can achieve that— But it's not banning speech, right? It's banning who pays for the brokerage fee. Now, I understand your argument that it impacts First Amendment, because it has an impact on commercial speech. But that's not the—when looking, applying the task, you look at what is the substantial interest of the city. And I'm more focused, we're sort of beyond the, you know, assume there's a First Amendment. Right. So if I spot you the interest, then they have to show the tailoring also under Central Hudson. And that's where so many laws have failed and where I think that's where, quite frankly, this law fails, because it doesn't show why burdening the speech of the brokers—maybe, if you don't want to say banning, at least significantly burdening the speech of tenant pay brokers—is going to achieve any of the do, except by saying that, well, if we burden the speech, we've eliminated tenant pay broker fees. But if that's the goal, then you can address the issue of tenant pay broker fees directly. That's the lesson of Sorrell, of 44 Liquor Mart, and of Virginia Board of Pharmacy. But the test isn't whether it's going to be effective or whether there's a better way to do it. It's whether the way that's been—the infringement is tailored to address the issue, right? It is, but it's a—it's a very rigorous tailoring. I mean, what Thompson versus Western State Medical Center said is that if you can achieve the goal without burdening speech or burdening less speech, that's what you have to do. And so when you look at things like Central Hudson and Thompson and all the others, they go through and say, here are lots of other things you could do to achieve the goal. It's not rational basis review where you say, look, I know it's not perfect, but, you know, we give—we give deference, because you're burdening the first amendment interests. I do also have the contracts claim. Yeah. Could you—I had a question about that. I mean, the city is—says in its briefing that you've identified one contract and that there's now a moodness issue. Could you address that point? Certainly, Your Honor. Of course, when we presented the five contracts in the district court, we didn't know when the district court would decide the case. We didn't know when this case—when this court would hear the case. I think what I'd say is if the court would like another contract from us that goes beyond October 31st, we are more than happy to present it. But, you know, on the record as it came to this court, we had a perfectly fine set of contracts. It was just the passage of time. So if the court wants us to address that issue, we're more than happy to do it. But— I don't know what you mean by that. I mean, we're here to adjudicate your case on a record that's before us. Right. And on the record— You're offering us a different record. Well, the problem seems to be that the moodness issue only occurred on Halloween when the last contract that we—I don't even know if it's a moodness issue, Your Honor, because it's not moodness as the case. It's maybe at most as the preliminary injunctive relief because the claim is you don't have a particular contract that this injunction would apply to. We pleaded in the complaint that there are countless contracts— But I thought the Fair Act precluded entering into any future contracts that involve this type of payment. So how can you allege there's a current contract, unless it was one that was created before the Act was passed and somehow is still ongoing? Yes. Otherwise, it is moot, isn't it? And there are contracts that meet that definition. The injunction we are asking for under the Contracts Clause claim is only for contracts that predate the effective — the passage— That are still ongoing today. That are still executory today. But you're offering a contract that wasn't part of your case. Oh, but it was part of our — I mean, at the time that the district court ruled, I mean, our contracts were still executory. What happened — I mean, what they are faulting us for is not presenting a contract, not understanding that the district court would rule when it was and the court would hold argument and this court would hold argument when it did. If this court had held argument two months prior, we wouldn't have this issue. Well, wasn't there evidence? I mean, Vaughan, New York, alleged it had many tenant pay exclusive listing arrangements. There were affidavits that— That's right. —said that these contracts go beyond a year. I mean, I'm— So that's right. There's not a specific contract, but there's definitely evidence before us that these contracts exist. That's absolutely right, Judge Livingston. There is evidence that say these contracts do exist and they go for a while. The response we got was, well, show us a contract. So we gave them five contracts. It just so happens that the five contracts that we pulled as exemplars happened to have expired — the last one expired on Halloween. But that doesn't take away from the fact that there is evidence that there are contracts that do fit the definition of what would fall within the contract's claim. It's just that I don't have a particular contract, a — you know, for specific billing. Why wouldn't you have given the court a contract that went on for, you know, presumably indefinitely? Although I suppose they'd now violate the law, wouldn't they? Well, I — you know, I don't think people enter into indefinite relationships or don't, you know, enter into limitless relationships because you want the ability to reassess your relationship with your broker. The fact that the five contracts we pulled just didn't happen to fall within the range of when this case was decided and argued, I think, is a coincidence of the contracts we pulled. But we had to — you know, at the time we compiled this record, they were within the period that they would have checked. It just happened to be that Halloween was the last one. So your representation to this Court is that there are contracts that are still ongoing? Yes. Like, they don't expire in two weeks or a month? I have asked directly, and I have been told that if — you know, if this — if the Court wants a particular contract that is still executory, we can get that. And as Judge Livingston mentioned, there is more general testimony and affidavits in the record that said these contracts, some of them do go for quite some time, and there are contracts that would fall within the injunction. I agree that, you know, as time goes on, the number of contracts the injunction would apply to are fewer and fewer as contracts time out. But that's just, you know, a fact of how contracts clause claims work.  Thank you, Your Honor. A little shorter than my friend. May it please the Court, my name is Jameson Davies for the Appellees. This Court is to affirm the District Court's orders denying a preliminary injunction and dismissing the plaintiff's First Amendment claims and denying a preliminary injunction as a contrast clause claim. Plaintiffs lost the policy battle and now attempt to recast their policy objections as constitutional ones. But these attempts fail as the District Court properly held. First, as to the First Amendment claim, the Fair Act simply does not affect speech. The law doesn't bar the publication of anything by anyone. Could you slow down? Sure. Sorry. Thank you. Apologize. Instead, it merely provides that if a broker lifts an apartment with the landlord's permission, the broker cannot later on engage in the conduct of collecting a thief in the broker. It's a conduct regulation, not a speech regulation. How do you square that with the U.S. v. National Treasury case, Expressions here, Design v. Schneiderman? How do you square that position? I know it's regulating payment and not speech, but how can you say it doesn't impact on speech? Sure. At least commercial speech. So those cases talk about banning being paid for the speech itself. So if you look at the Treasury Employees Union case, that barred people from getting paid for giving speeches or writing books. If you look at the Veterans Guardians case, they talk about that barred people from getting compensation for their speech, for consulting with veterans on these claims. Aren't the brokers getting compensation in their fees, in part, for their speech, for advertising and listing? Exactly right. So they're getting compensation for consummating the transaction. The speech is a predicate to that, but the regulatory object and what they're getting compensation for is the deal. So if you look to something like Clementine, where the feeder said, you know, this is making it less profitable for us to engage in the speech you're putting on a plate, the court said, no, that's, you know, the fact that it's merely making your speech less profitable is not a First Amendment issue unless the regulatory object of the law is to regulate speech itself. And here, the regulatory object of the law is to regulate the conduct. Didn't Clementine just essentially, it involved a theater, so there was a speech at issue, but it was a generally applicable law about holding public events and the need to check vaccination status before you hold such events, right? It was a generally applicable law, but I think the rationale works here. And here, this law is, you know, it's not generally applicable only in the sense that to regulate brokers, it wouldn't, you know, you can't, it in theory applies to everybody, but brokers are the only relevant constituency to be regulated by this because they have to be licensed by the state. Well, I mean, here it regulates brokers and it prohibits them from charging a fee to a particular class of people they would otherwise charge because of their speech. I mean, that's the way, that seems pretty far afield to me from Clementine. So help me understand what I'm missing. Sure. I wouldn't say it's because of their speech. I would just say that there is a, you know, a predicate speech act that happens. And there's a lot of times that happens. There's a lot of laws that have some incidental effect on speech. This court's decision in the Ku Klux Klan case that we cite and numerous others. The fact that there is some decrease in speech or some effect on speech isn't the question. The question is whether the regulatory object of the law is to bar speech. Assuming for the moment that it did impact on speech, can we get to the second issue, which is your position that the FAIR Act survives the intermediate scrutiny test, which you claim should be applied, not the test in Sorrell. Right. I mean, I think the test in Sorrell is sort of a misnomer because Sorrell didn't announce a different test, as this Court is recognizing Hugo. But yes, we satisfy intermediate scrutiny. The law addresses several substantial government interests. It directly advances those interests, and it's not more extensive than necessary. I think it's important to take a step back as well as this case is talking about, you know, A2, a particular subdivision, at least as to the First Amendment claim. But, you know, when you're talking about the law's interests and how it addresses them, that was a subpiece of the law that addressed a specific potential loophole that the counsel identified during the course of addressing this law or addressing the issue. But, you know, the law as a whole is what we're looking at. But A2 dealt with the reality of, you know, as the counsel investigated, as numerous people testified, is you show up, you're given, you've already paid potentially a nonrefundable fee, you're given a huge stack of papers to sign. The bottom paper says, oh, by the way, I was acting as your agent, so you have to pay me. And that, the counsel recognized that that's not really a true agency relationship, that it was an exploitative transaction, as even a revenue broker testified it's an exploitative transaction. So that, well, the A2 piece seals that loophole and says, you know, even if you're nominally acting as the tenant's agent, if you've advertised on behalf of the landlord, if you're really working for the landlord, then you have to be paid by the landlord. Why is that, please, why is that necessary to address the policy interests that the regulation is aimed at? I mean, why not just prohibit the conduct, prohibit having tenant fees? I think it's necessary in the sense that the city council, as is in the record throughout, they didn't want to ban tenant brokers. You can still go and have a tenant broker, they can go and work on your behalf. So the council was navigating where they wanted to continue to have real estate brokers who worked on behalf of tenants, but they didn't want this situation that they'd identified through their investigations. And I think it's important to add 50 people go out and not one of them got an agreement at the outset saying, oh, by the way, you know, this is a fee, I am working on your behalf. So it's addressing the real world situation here. And I think it was, you know, charting a path between completely banning the fees, which they objected to, you know, the city council was addressing their objections in adding this piece, revenue's objections, revenue broker's objections. And the antiquities case that we have to be a perfect fit, it has to be a reasonable fit. And there's deference given to the city's identification of the issues and its conclusions about whether or not the law is likely to satisfy those concerns. And that's also in view as well. And I think, you know, we've identified three issues that really don't dispute us on the fairness and transparency issue. They sort of barely dispute us by making arguments about the record on the housing mobility issue. But I think if you look to the committee report only, which I don't think there's any reason to suggest that the legislative history is limited to the committee report, the committee report, as the district court concluded, and I'll point you to 672 and 673 of the record, talked about the housing mobility issues. You know, they're cherry picking one sentence out of the committee report. But that was throughout the committee report. And the district court concluded that as well, both in the order on appeal here and the later order denying a motion for a state pending appeal. Can you address the contracts clause issue and the mootness? Sure. So they — one, I think it's important to step back. On this issue, in their reply, they cite a motion to dismiss case. But we're past motion to dismiss. They bear the burden on a preliminary injunction of showing irreparable harm. To show irreparable harm, they have to show that there are some contracts out there that would be affected by the preliminary injunction that they seek. And they haven't done so. They put in five contracts, four of which were already post the date that they say is the cutoff. So really only one contract was ever at issue, potentially. That contract has expired. And so there's really no indication. And they bear the burden on this issue, as we point out in the Giuliani case. They have to provide some evidence that the preliminary injunction is going to have some effect, that there's some irreparable harm that they can — that they can show. If you look to their — the affidavit they're talking about — I think the one they're saying anything about — it says, you know, we have some contracts. They might extend for a while. It doesn't say, really, what — that there are going to be contracts that were entered into before the cutoff date and expire afterwards. And I think also, even if there are some that might, you know, be going on, you know, on remand, maybe they can point to some, it's important to note also that the — two things, which is that they're not allowed, under New York State law, to have automatically revolving exclusive listing agreements. So there's going to be cutoff dates for all of these at some point. If you look to the ones they put in, they're usually six months or a year. That seems to be the industry standard. So, you know, they're likely to expire anyways. And Sanitation and Recycling says if there's a limited time left on these contracts, it's much less likely there's going to be a substantial impairment caused by the law. Let's assume that we get past your mootness point. And could you address on the contract claim the fact that there — an earlier version of the Act, I think, did provide that it would apply to transactions entered into after the law's effective date? I mean, why did — why was there any need to reach these contracts that we're talking about? Sure. So what the counsel was concerned with was that folks would, you know, during sort of the pendency of the law, would rush to enter into these very — into very long-term contracts that would essentially put them outside of the law's scope. You know, they would — But this would be — wouldn't they be vulnerable to a foreseeability attack? I think they still would be vulnerable to the foreseeability attack, potentially. The — you know, the concession that this was foreseeable as of the date of the law's introduction didn't come until litigation. I think the counsel could reasonably have concluded that if they'd passed that law, Revenue would be here making the opposite argument, that it wasn't foreseeable until the law was actually in effect. So I think they — you know, they don't have to assume that Revenue's going to make that concession later on in litigation. And I also want to note that these are sort of strange contracts in terms of substantial impairment, because it's a contract between two parties that just says, by the way, a third party is going to have to pay the fee, who's not a party to this contract. We don't even know who it is yet. So, you know, the fact that they're being impaired from paying — being paid by someone who's not even a party to the contract, who they have, at most, a very contingent right to collect from, I don't think there's a significant impairment in that sense. Unless there are any further questions, we'd urge the Court to affirm. We'll hear Rebecca. Thank you, Your Honor. I want to start by addressing the loophole that my friend on the other side seems to think that the publication bar — the publication burden addresses. But the simple problem with that is, is that if the city's investigation found that some people who are tenants' agents are not living up to their obligations, you should hold them to their obligations. So take, for example, the tenant's agent who only discloses his status at the closing. Well, actually, New York real property law 443 requires that the first substantive contact between the broker and the tenant, they be given a disclosure form that says whose behalf I'm working on. Well, if they're not complying with that law, you should hold them to comply with that law. If you think there are additional prophylactic measures that need to be taken to disclose who you're working on behalf of, maybe you can do that. But what you can't do is say that, well, we're not going to let you advertise your particular apartments and still collect tenant pay brokerage fees, which is, again, perfectly legal under New York law. It's only when you have engaged in speech as a precedent to that, that your right to collect from the tenant is taken away. So at most, what the city's investigation shows is you should deal with brokers who are not doing their jobs. It's not that you should be burdening speech. Second, with respect to transparency, the city acknowledged on JA678 that we are addressing transparency through a separate provision of the law that requires that you clearly disclose on any listing who the fees are going to be paid by and what they are. And that solves transparency because it's now on the street easy listing before you ever contact the broker, which is what the city's investigation revealed, which is I wasn't aware of the fee until I was to the closing. Finally, with respect to the contract claim, there is, as has been pointed out, general information in the record that there are many contracts. The fact that the particular ones that we gave are not still effective doesn't take away from the fact that there is still evidence to survive the mootness. Where is that evidence of the contracts and their exact date? Well, it's not their exact, it is their not, it's not their exact date, Your Honor. It's the bond affirm, it's the bond declaration and then the declaration that my friend pointed out, which says that we have these exclusive listing agreements that continue for a long. I looked at that. If it was page 938, it said one year. In the latest, January 2025, latest listing. So what the bond declaration says is many of them last one year. Some last beyond it. I agree with you that he does not say I have a particular building and it is still continuing to this particular date. So none of them is identified? There is not a particular building identified. I will give you that. Sorry? There is not a particular building for which we are the exclusive broker firm. There's not a particular contract identified. I'm sorry, Your Honor? There's not a particular contract identified. There is not a particular contract. I will give you that much, yes. Thank you, Your Honor. Thank you both and we'll take the matter under advisement.